UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM JOSEPH MILLER, JR.,

                Plaintiff,         Case No.: 11-cv-15678
                                      Honorable Bernard A. Friedman
        v.                           Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 11]**

Plaintiff William Miller brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the court finds the ALJ did not err in relying on the vocational expert's testimony about the jobs available to Miller, and in his ultimate conclusion that Miller was not disabled. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [11] be GRANTED, Miller's motion [10] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On December 9, 2008, Miller filed an application for DIB, alleging disability as of September 26, 2006. (Tr. 90-96). The claim was denied initially on January 30, 2009. (Tr. 44-47). Thereafter, Miller filed a timely request for an administrative hearing, which was held on September 16, 2010, before ALJ John Ransom. (Tr. 24-39). Miller, represented by attorney Mikel Lupisella, testified, as did vocational expert ("VE") Paulne McEachin. (*Id.*). At the hearing, Miller amended his alleged onset date to April 18, 2007. (Tr. 27). On October 1, 2010, the ALJ found Miller not disabled. (Tr. 13-23). On October 28, 2011, the Appeals Council denied review. (Tr. 1-6). Miller filed for judicial review of the final decision on December 28, 2011 [1].

### B.     Background

#### 1.     Disability Reports

In an undated disability report, Miller reported that the condition limiting his ability to work was rotator cuff problems in both arms. (Tr. 119). He reported that this condition prevented him from lifting anything "horizontally with both arms individually." (*Id.*). His condition first interfered with his ability to work in 2005, but he continued to work as an iron worker until he retired in September 2006. (Tr. 119-20). He reported seeing two doctors for his condition, as well as taking Meloxicam for "joints/arthritis" and Tramadol for pain "as needed." (Tr. 121-24).

In a January 2, 2009 function report, Miller reported that he lived in a house with family and that he did not do much during the day because it was winter, and also because he was currently hooked up to a 24-hour IV due to shoulder surgery complications. (Tr. 131). He

reported that his condition made it difficult to put on socks and tuck in his shirt, and that it interfered with his sleep. (Tr. 132). He was capable of feeding his dog, preparing standard meals two to three times a day for an hour, and laundry. (Tr. 132-33). He reported going out as often as possible and that he could drive a car and go out alone. (Tr. 134). He also reported shopping for groceries once a week. (*Id.*). His interests included reading, hiking, fishing and hunting, but his ability to hunt had been impeded by his condition. (Tr. 133). He also reported participating in church, Knights of Columbus and the American Legion "as often as possible." (*Id.*). Miller reported that his condition interfered with his ability to lift, reach and complete tasks. (Tr. 136). He reported no other physical, and no mental, limitations. (Tr. 136-37).

In an undated disability appeals report, Miller reported that his condition had changed and that he now had severe pain in his shoulders and a failed shoulder surgery that prevented him from using his shoulders. (Tr. 154; 157). He reported no new limitations based on this change. (Tr. 154). He continued to report being prescribed the same medications. (Tr. 156).

### 2.   *Plaintiff's Testimony*

Miller testified that he suffered from shoulder pain and that the last company he worked for "basically [] carried [him] … until [he] could get enough hours in" even though he could not do the work. (Tr. 29-30). He testified that his shoulder condition had gotten progressively worse over the years and that he could not lift his left arm above the horizontal level, although he could lift it to desk level. (Tr. 33). He could lift his right arm further than his left and he was able to lift a gallon of milk. (Tr. 34). He had surgery on his left shoulder but it had become infected due to the hardware that had been implanted. (*Id.*). The hardware was removed and Miller did not expect to have another surgery. (Tr. 35). Miller testified that he could live with his pain during the day but that it wakes him up three or four times a night. (*Id.*). He is treated by his family

doctor and receiving medication for the pain. (*Id.*).

Miller testified that his day consists of making breakfast, feeding the chickens and "I guess [the] same thing everybody else in the world does." (*Id.*). He testified that he does some yard work, and "play[s] in the garden," but that his wife mostly mows the grass. (Tr. 35-36). He washes dishes and does the laundry, and he and his wife grocery shop together. (Tr. 36). He testified that he has a driver's license and is able to drive. (*Id.*).

### 3. *Medical Evidence*

#### a. *Treating Sources*

An MRI taken of Miller's left shoulder on May 31, 2002, showed a small rotator cuff tear. (Tr. 237). X-rays taken of Miller's left shoulder on October 1, 2003, were negative. (Tr. 236). Miller had no shoulder or neck complaints at appointments with his primary care physician on October 12, 2006, November 1, 2006, or March 9, 2007. (Tr. 219-24). At a March 30, 2007 appointment, Miller complained of upper back pain, right arm numbness and bruising on his chest. (Tr. 218). Upon examination he was found to be tender over his left anterior thoracic cage, and he was diagnosed with thoracic muscle spasms and a left rib contusion. (*Id.*). His back pain increased with lifting. (*Id.*). Miller had a follow-up appointment regarding his arm on April 18, 2007, and he reported that it was no better. (Tr. 217). Upon examination the doctor found that his grip strength was good and that someone (illegible) did not "feel symptoms warrant surgery at this point." (*Id.*). He was diagnosed with right C6 radiculopathy and an MRI was suggested "if symptoms persist." (*Id.*). Miller had no complaints relating to his neck or shoulders at appointments on July 6, 2007, October 15, 2007, or February 18, 2008, although it was noted in October 2007 that he was using Mobic and Ultracet "as needed for joint pain." (Tr. 213-16).

At a May 9, 2008 appointment, Miller complained of left shoulder pain with abduction, extension and rotation. (Tr. 211). He was diagnosed with left shoulder impingement and prescribed Tramadol. (*Id.*). At an appointment on June 13, 2008, Miller reported bilateral shoulder pain that had been going on for four weeks. (Tr. 209). He reported no other new problems and that he was feeling well. (Tr. 210). Upon examination the doctor found a reduced range of motion in his shoulders, worse in the left than the right, and good grip strength. (Tr. 210). Miller was diagnosed with impingement syndrome in his shoulder and right C6 radiculopathy. (Tr. 209). The doctor ordered MRIs of Miller's neck and cervical spine. (*Id.*). A July 2, 2008 MRI of Miller's cervical spine revealed "[m]oderate to severe disc osteophyte complex at C6/7 with moderate to severe narrowing of the right neural foramina" and "minimal narrowing of the right neural foramina at C5/6." (Tr. 175). An MRI of Miller's left shoulder performed the same day found a "[f]ull thickness tear of the supraspinatus tendon with approximately 2 cm retraction. There is evidence of at least partial tear at the intersection of the infraspinatus tendon." (Tr. 192). An MRI of his right shoulder performed the same day showed a "[s]mall full-thickness tear at the insertion of the supraspinatus tendon with minimal retraction…[and] the possibility of a partial tear at the insertion of the infraspinatus tendon." (Tr. 194).

On August 28, 2008, Miller consulted with surgeon Dr. Eric Cornish regarding his left shoulder pain. (Tr. 243). Miller reported that he had had left shoulder pain "for several years," but that it had increased from his "doing quite a bit of heavy work over the summer." (*Id.*). Upon examination, Dr. Cornish found that his left shoulder had elevation to 160 degrees, abduction to 140 degrees and an internal rotation to L2. Neer and Hawkins impingement signs on that shoulder were positive and Miller had strength of 4/5 on both resisted abduction and

5

resisted external rotation. (*Id.*). His AC joint was benign. (*Id.*). Miller's right shoulder had forward elevation and abduction to 160 degrees, internal rotation to L1. (*Id.*). Neer and Hawkins impingement signs on that shoulder were negative and he had good strength on resisted abduction and external rotation. (*Id.*). His AC joint was benign. (*Id.*). Dr. Cornish reviewed Miller's x-rays and MRIs and concluded that he had a left shoulder rotator cuff tear and a partial thickness tear of his right shoulder. (*Id.*). Dr. Cornish noted that an x-ray of Miller's left shoulder showed mild degenerative changes at the AC joint and Type II acromion, but an "[e]ssentially normal left shoulder." (Tr. 427). Dr. Cornish advised surgery for Miller's left shoulder, but not his right as it was "not currently symptomatic, but we could consider injection or arthroscopy as symptoms warrant." (*Id.*).

At an August 29, 2008 appointment with his primary care physician, Miller reported that he had scheduled shoulder surgery for December 1, 2008. (Tr. 208). He also reported a left ankle injury. (*Id.*). At an appointment on November 7, 2008, the doctor noted that there was an increase in Miller's "aches and pains" and that he was having rotator cuff surgery. (Tr. 207).

On November 30, 2008, Miller agreed to undergo surgery for a torn left rotator cuff. (Tr. 181-82). Surgery proceeded on December 1, 2008, and was initially successful. (Tr. 183-85). At an initial post-operative follow-up appointment, Miller's incision appeared to be healing, and he had no tenderness at the biceps or Popeye deformity. (Tr. 294). He was noted to tolerate passive elevation to almost 100 degrees. (*Id.*). Miller began a course of physical therapy on December 15, 2008, and reported an initial pain level of 2 out of 10. (Tr. 289-90). However, on December 21, 2008, he presented to the emergency room with an infection in his surgical wound. (Tr. 248). The doctor prescribed Rocephin and referred Miller to Dr. Cornish the following day. (*Id.*). The next day, Dr. Cornish saw Miller and noted that the surgical wound was

"erythematous, slightly fluctuant and warm, suggestive of a wound infection." (Tr. 249). He found no pain with passive range of motion of the joint itself. (*Id.*). Dr. Cornish recommended opening the wound and irrigating it and placing Miller on an IV antibiotic for two weeks. (*Id.*; Tr. 263-64). Miller agreed. (*Id.*). The following day, Miller was postoperative and "generally comfortable on oral pain medications." (Tr.262). A drain was placed in his wound for five to seven days, and his IV antibiotic was recommended to continue for six weeks. (*Id.*). Miller was discharged from his original post-operative physical therapy plan due to his infection. (Tr. 286-87).

At a January 8, 2009 follow-up with Dr. Cornish, Miller's infection was found to be improving, and he had forward elevation in his shoulder to 120 degrees and no pain with range of motion. (Tr. 395). At a January 29, 2009 follow-up appointment, an examination found a nicely healed wound with no signs of infection. (Tr. 378). Miller had forward elevation to 90 degrees, but no abduction. His strength on resisted abduction and external rotation was 4/5. (*Id.*). Dr. Cornish recommended a re-repair in twelve weeks but Miller requested that it be closer to the end of summer. (*Id.*). At a February 17, 2009 appointment with his primary care doctor, tenderness was noted in Miller's left shoulder as a result of his infection following surgery. (Tr. 319).

At a follow-up with Dr. Cornish on March 3, 2009, an examination found a well-healed incision with some disruption of the deltoid attachment (approximately 1.5 cm). (Tr. 368). Dr. Cornish found no sign of infection. (*Id.*). He noted forward elevation of the left shoulder to 100 degrees, abduction to 80 degrees and a full passive range of motion. (*Id.*). Miller also had 4/5 strength on resisted abduction and external rotation and 5/5 strength on liftoff. (*Id.*). His impression was a "[l]eft shoulder rotator cuff repair complicated by infection which seems to be

cleared." (*Id.*). Dr. Cornish recommended returning to surgery to re-repair the rotator cuff in three to six months, but Miller stated that he "would like to wait until late fall because of work constraints." (*Id.*). An x-ray taken the same day of Miller's left shoulder showed an "[e]ssetially normal shoulder with postoperative arthroscopic acronioplasty."[1] (Tr. 369). Miller appeared to have no complaints related to his shoulder or neck at appointments with his primary care physician on August 31, 2009, December 14, 2009, March 17, 2010, April 28, 2010, or September 15, 2010. (Tr. 430-36).

> b. *Consultative and Non-Examining Sources*

On September 17, 2008, Miller was examined by Dr. J. Eric Zimmerman at the request of his primary care doctor, for a neurosurgical consultation. (Tr. 178). Miller reported ongoing right arm pain that had, in the past, been severe, but now had resolved with only "some numbness in a C6 distribution." (*Id.*). He reported no weakness except that he was limited by his "painful shoulders." (*Id.*). Upon examination, Dr. Zimmerman noted a negative Spurling's maneuver and an absent Lhermitte's phenomenon. (*Id.*). Miller's range of motion in his neck was normal, but his shoulder exam was painful with active and passive ranging. (*Id.*). His strength was normal in his deltoids, biceps and triceps. (*Id.*). His hand intrinsics were innervated, and he had no clonus, hyperreflexia or pathologic reflexes. (*Id.*). Dr. Zimmerman concluded that Miller had "a resolved right C6 radiculopathy with some sensory deficit, which we at this point I do not think could correct surgically as there does not seem to be evidence of ongoing nerve root compression." (*Id.*).

On January 30, 2009, an RFC assessment was rendered by Department of Disability

---

[1] The date on this report indicates that the x-ray was taken on March 3, 2006, but since there is no record of any left shoulder surgery by Dr. Cornish prior to December 2008, and because Dr. Cornish also examined Miller on March 3, 2009, the court assumes the date of this report is simply inaccurate.

8

Services examiner Matthew Branch, upon review of the medical records to date. (Tr. 306-13). He found Miller capable of lifting 20 pounds occasionally and 10 pounds frequently, standing and/or walking about six hours of an eight-hour day, and sitting for the same amount of time. (Tr. 307). He found that Miller was limited to only occasional pushing and pulling with his upper extremities. (*Id.*). He had no postural, visual, communicative or environmental limitations, but was limited to only occasional overhead reaching bilaterally. (Tr. 308-310). He had no other manipulative limitations. (Tr. 309).

### 4.    *Vocational Expert's Testimony*

VE Paulne McEachin testified at the hearing. (Tr. 37). The ALJ asked her to assume a hypothetical claimant of Miller's age, educational level, and vocational background, who was able to perform light work but restricted to "no repetitive pushing, pulling, torqueing, or reaching; no air or vibrating tools; and no above shoulder work." (*Id.*). He then asked if there were jobs in the economy existing in significant numbers that such a person could perform. (*Id.*). The VE testified that such a person could perform the job of information clerk (1,700 jobs in the regional economy), security guard, (6,000 jobs) or visual inspector (2,200 jobs). (Tr. 38). The ALJ asked the VE whether her testimony conformed generally to the Dictionary of Occupational Titles ("DOT"), and she testified that it did. (*Id.*). Miller's attorney did not ask any questions of the VE. (*Id.*).

### C.    **Framework for Disability Determinations**

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

9

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Miller not disabled. At Step One, he determined that Miller had not engaged in substantial gainful activity since his alleged amended onset date of April 18, 2007. (Tr. 19). At Step Two he found that Miller suffered from

the following severe impairments: "degenerative disc disease and bilateral shoulder pain." (*Id.*). At Step Three he determined that Miller's severe impairments, either alone or in combination, did not meet or medically equal a listed impairment. (*Id.*). The ALJ then assessed Miller's residual functional capacity ("RFC"). (Tr. 20). He found Miller capable of light work "with restrictions of no repetitive pushing, pulling, torqueing or reaching, no air or vibrating tools and no above the shoulder level work." (*Id.*). At Step Four the ALJ determined that Miller could not perform his past relevant work which was skilled and medium to heavy in exertion. (Tr. 21). Finally, at Step Five the ALJ concluded, based on VE testimony, that there were a significant number of jobs existing in the national economy that Miller could still perform based on his age, education, vocational background and RFC. (Tr. 22). Therefore, he was not disabled. (Tr. 23).

**E.     Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

Miller raises only one argument – that the ALJ erred in accepting the VE's testimony as to the types of jobs he was capable of performing given his RFC.[2] Miller argues that the jobs

---

[2] Miller's failure to make any other arguments regarding the ALJ's decision results in his waiver

cited by the VE are outside his given restrictions; he states that the job of information clerk is a skill-level 4 job, which would take it out of the unskilled category, that the job of security guard entails apprehending persons, which would (according to him) violate the reaching and above-shoulder work restrictions imposed by the ALJ, and that the job of "visual inspector" cannot be found in the DOT. Miller's argument lacks merit.

As the Commissioner correctly notes, the fact that the job title to which the VE testifies does not line up perfectly with the DOT does not render the VE's testimony inconsistent with the DOT as a whole. *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009). The Sixth Circuit in *Lindsley* noted that the DOT's listed occupation titles "are collective descriptions of 'occupations' that can encompass numerous jobs." *Id.* With regard to the title of "information clerk," the DOT contains a category entitled "Receptionists and Information Clerks" that lists several types of information clerks ranging in skill level, two of which fall into the unskilled category. (*See e.g.* DOT 237.367-018 "Information Clerk"; and 237-367-046 "Telephone Quotation Clerk"). Occupations with a skill rating of 1 or 2 are considered unskilled. *See Frye v. Astrue*, No. 11-1019, 2012 U.S. Dist. LEXIS 69520 at *63 (N.D Ohio Apr. 9, 2012) adopted by 2012 U.S. Dist. LEXIS 69518 (N.D. Ohio May 18, 2012) *citing* SSR 00-4p, 2000 SSR LEXIS 8. Therefore, the fact that one type of "information clerk" is a skill level 4 job did not render the VE's testimony erroneous.

With regard to the job of visual inspector identified by the VE, the fact that this specific job title does not appear in the DOT does not mean that unskilled visual inspector occupations do

---

of any such arguments. *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted).

not exist. As the Sixth Circuit has stated, "not all occupations are included in the DOT, and the VE may use terminology that differs from the terms used in the DOT . . . the mere fact that the DOT does not list occupations with those precise terms does not establish that they do not exist." *Beinlich v. Comm'r of Soc. Sec.*, 345 Fed. Appx. 163, 168 (6th Cir. 2009). Notably, Miller only challenged the absence of "visual inspector" in the DOT; he does not argue that such occupations do not actually exist, nor does he challenge the VE's testimony regarding the availability of jobs in that field that he could perform.

With regard to the job of security guard, the Commissioner correctly points out that the ALJ did not restrict Miller to "no reaching," as Miller suggests (Doc. #10 at 8), but no *repetitive* reaching. (Tr. 20). Furthermore, even if an inconsistency did exist between Miller's RFC and the occupational requirements of a security guard, "the ALJ is under no independent obligation to verify the accuracy of the VE's testimony beyond what is required under Ruling 00-4p, 2000 SSR LEXIS 8, which the ALJ did here.[3] Nor is the ALJ bound by the DOT in making his final disability determination." *Baker v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 84284 at *14 (E.D. Mich. June 18, 2012) As the Sixth Circuit stated in *Beinlich v. Comm'r of Soc. Sec.*, 345 Fed. Appx. 163 (6th Cir. 2009):

> Even if there were an inconsistency, the plaintiff has not pointed to any authority that the ALJ erred in his findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued his decision. As an initial matter, neither the ALJ nor the VE is required to follow the DOT. *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (holding that "the ALJ and consulting vocational experts are not bound by

---

[3] Ruling 00-4p provides, in pertinent part: "When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." The ALJ clearly satisfied his obligation in that regard when he asked the VE whether her testimony conformed generally to the DOT, to which she answered in the affirmative. (Tr. 38).

14

> the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications"). The ALJ fully complied with SSR 00-4p, 2000 SSR LEXIS 8 when he asked the VE whether there was "any discrepancy between [her] opinions and the DOT standards for the requirements of the jobs [she] named." *See Lindsley*, 560 F.3d at 606 (holding that the ALJ fulfilled his duties when he asked the VE whether there was any "discrepancy between your opinions and the DOT standards," even if the VE did not disclose a conflict). As *Lindsley* makes clear, the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p, 2000 SSR LEXIS 8. Id. This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. The fact that plaintiff's counsel did not do so is not grounds for relief. See *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir.2008).

*Id.* at 168-69. As noted above, here the ALJ specifically asked the VE at the conclusion of her testimony whether it was consistent with the DOT. (Tr. 38). She responded that it was. (*Id.*). The ALJ was not required to make any further inquiry on this matter. *Beinlich*, 345 Fed. Appx. at 168-69; *Lindsley*, 560 F.3d at 606. Moreover, despite expressly being given the opportunity to question the VE at the conclusion of the ALJ's questioning (Tr. 38), Miller's counsel failed to make any further inquiries or challenges to her testimony, thus waiving any argument he may otherwise have had regarding the skill level and occupational requirements of the occupations that the VE testified were available to him. *Beinlich*, 345 Fed. Appx. at 168-69.

For the above reasons, and upon an independent review of the entire record, the court concludes that the ALJ's decision is correct and supported by substantial evidence in the record.

### III. CONCLUSION

For the foregoing reasons, the court RECOMMENDS that MILLER'S Motion for Summary Judgment [8] be DENIED, the Commissioner's Motion [10] be GRANTED and this case be AFFIRMED

15

| | |
|---|---|
| Dated: August 27, 2012 | s/David R. Grand |
| Ann Arbor, Michigan | DAVID R. GRAND |
| | United States Magistrate Judge |

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 27, 2012.

                                                                         s/Felicia M. Moses
                                                                         FELICIA M. MOSES
                                                                         Case Manager